# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
# MILWAUKEE DIVISION

| | |
|---|---|
| EMIR FETAI, Individually and on Behalf of All Others Similarly Situated, | Case No.: 18-cv-1564 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| MIDLAND CREDIT MANAGEMENT, INC. and MIDLAND FUNDING, LLC, | **Jury Trial Demanded** |
| Defendants. | |

Plaintiff Emir Fetai (hereinafter referred to as "Plaintiff"), individually and on behalf of all others similarly situated, alleges on personal knowledge, investigation of his counsel, and on information and belief as follows:

## NATURE OF ACTION

1. Plaintiff brings this action for damages, and other legal and equitable remedies, resulting from the illegal actions of Defendant in contacting Plaintiff and Class members on their cellular telephones without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. (hereinafter referred to as the "TCPA").

2. Defendants violated the TCPA by contacting Plaintiff and Class members on their cellular telephones via an "automatic telephone dialing system," ("ATDS") as defined by 47 U.S.C. § 227(a)(1), and/or by using "an artificial or prerecorded voice" as described in 47 U.S.C. § 227(b)(1)(A), without their prior express consent within the meaning of the TCPA.

3. Defendants placed several telephone calls to Plaintiff's cellular telephone using an ATDS system, attempting to collect two separate alleged debts: 1) Plaintiff's "Menards" consumer credit card account originally owed to Capital One, N.A. ("Capital One"), and 2)

Plaintiff's father's "Boston Store" consumer credit card account, originally owed to Comenity Bank ("Comenity:").

4. Defendants recently settled similar TCPA claims in this MDL on a class-wide basis for approximately $20.6 million. https://www.midlandtcpasettlement.com/ Home.aspx. The class period for the settlement is from November 2, 2006 through August 31, 2014, inclusive. *Id.*

5. Despite the settlement, Defendants have apparently not sufficiently changed their practices to cease placing autodialed calls to cellular telephones without consent. Plaintiff received autodialed telephone calls from Defendants on cellular phones without providing the phone number to Defendants.

6. Plaintiff thus seeks to certify a class of individuals who received ATDS calls from Defendants without consent, beginning on September 1, 2014, after the settlement class period closed.

7. Plaintiff brings this action for injunctive relief and statutory damages resulting from Defendants' illegal actions.

## JURISDICTION AND VENUE

8. The court has jurisdiction to grant the relief sought by the Plaintiff pursuant to 15 U.S.C. § 1692k, 28 U.S.C. §§ 1331 and 1337; *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 753 (2012) (holding that federal courts have federal question jurisdiction over TCPA claims.).

9. This Court has personal jurisdiction over Defendants because, as the conduct at issue occurred in or was directed toward individuals in the state of Wisconsin, Defendant has established minimum contacts showing it has purposefully availed itself to the resources and protection of the State of Wisconsin. Defendant does substantial business in Wisconsin.

10. Venue is proper in the United States District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1441(a), because a substantial part of the

2

events giving rise to the claims, namely automated telephone calls to persons in this District and debt collection activities, occurred in this District.

## PARTIES

11. Plaintiff Emir Fetai ("Plaintiff") is an individual citizen of the State of Wisconsin, who resides in the City of Kenosha, Kenosha County, Wisconsin.

12. Defendant Midland Credit Management, Inc. ("MCM") is a debt collection agency with its principal offices located at 3111 Camino Del Rio North, Suite 103, San Diego, CA 92108.

13. MCM is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

14. MCM is engaged in the business of collecting debts owed to others and incurred for personal, family, or household purposes. MCM is a debt collector as defined in 15 U.S.C. § 1692a.

15. Defendant Midland Funding LLC, ("Midland Funding") is a Delaware limited liability company with its principal place of business located at 8875 Aero Drive, Suite 200, San Diego, CA, 92123.

16. Midland Funding is engaged in the business of taking title to charged-off consumer debts, including credit card, auto deficiency and telecom receivables purchased from national financial institutions, major retail credit corporations, telecom companies and resellers of such portfolios. (Encore's SEC filing on form 10-Q, Aug. 8, 2008).

17. Midland Funding is engaged in the business of a collection agency, in that its principal purpose is to purchase and receive assignment of consumer credit card and telecom debts, which its agent, MCM collects on Midland Funding's behalf. MCM uses the mails and

3

telephone to collect consumer debts originally owed to others and currently held by Midland Funding. Midland Funding, directly or indirectly, is a debt collector under this arrangement. 15 U.S.C. § 1692a(6); *Tepper v. Amos Fin., LLC*, 2018 U.S. App. LEXIS 21907, at *16 (3d Cir. Aug. 7, 2018).

18. MCM and Midland Funding are under common ownership.

19. Both MCM and Midland Funding are direct or indirect subsidiaries of Defendant Encore Capital Group, Inc. ("Encore"), a publicly traded Delaware corporation, with offices at 8875 Aero Drive, Suite 200, San Diego, CA 92123.

20. Encore raises money in public securities markets to acquire the debts which are transferred to Midland Funding or other similar entities and collected by MCM. Encore also is responsible for the overall collection strategies used to collect the accounts.

21. Encore's webpage states:

If you are one of our consumers, you probably know us as Midland Credit Management (or MCM). Midland Credit Management, a subsidiary of Encore Capital Group, works with consumers to resolve past-due obligations. MCM services accounts after the originating creditor has charged-off the account.
...

If you have heard from MCM, your obligation to a lender is now your obligation to Midland Funding, LLC. Please give us a call at 1-877-240-2377 or visit online to learn about your options or discuss your account.
Please understand that Midland Credit Management is a debt collector. Midland Credit Management's communications with consumers are an attempt to collect a debt. Any information we obtain will be used for that purpose.

22. Encore is one of the largest debt buyers and debt collectors in the industry, with consumer debt portfolios in the hundreds of millions of dollars. Encore's 2013 10-K filing states that Encore has "one of the industry's largest financially distressed consumer databases." (Form 10-K, 12/31/13, p. 2).

4

23. Encore purchased similar amounts of U.S. consumer credit card accounts in 2012 and 2011 and has purchased similar amounts each year from 2013 to the present.

24. Encore describes itself as "a leading accounts receivable management firm" (Encore Capital Group Inc., Exhibit 99.1, filed with the SEC on March 15, 2006) and a "purchaser and manager of charged-off consumer receivables portfolios" (Encore Capital Group Inc., Form 424B3, filed March 1, 2011, prospectus summary).

25. On March 10, 2005, Encore stated to public investors that it is a "50 year old purchaser and manager of consumer receivables portfolios" (Form 8-K filed by Encore with the SEC on March 10, 2005).

26. "From inception through December 31, 2010, we have invested approximately $1.8 billion to acquire 33.0 million consumer accounts with a face value of approximately $54.7 billion" (Form 10-K filed by Encore with the SEC for the year ending December 31, 2010, original p. 1).

27. Encore states that it is responsible for developing collection strategies. Its Form 10-K for the year ending December 31, 2010 states: "We expand and build upon the insight developed during our purchase process when developing our account collection strategies for portfolios we have acquired. Our proprietary consumer-level collectability analysis is the primary determinant of whether an account is actively serviced post-purchase. Throughout our ownership period, we periodically refine this analysis to help determine the most effective collection strategy to pursue for each account" (Original page 4).

28. Among these strategies is outbound telephone calls. "During 2010, we called approximately 8.6 million unique consumers, of which 1.8 million, or 21%, made contact with

5

us" (Encore Capital Group, Inc. report on SEC Form 10-K for the year ending December 31, 2010, original page 4).

29. Similarly, in its Prospectus filed with the SEC on March 1, 2011, Encore Capital Group, Inc., stated ("Prospectus Summary"):

> We are a systems-driven purchaser and manager of charged-off consumer receivable portfolios . . . We acquire receivable portfolios at deep discounts from their face values using our proprietary valuation process that is based upon an analysis of the individual consumer attributes of the underlying accounts. Based upon our ongoing analysis of these accounts, we employ a dynamic mix of collection strategies to maximize our return on investment. . . . Acquisitions of receivable portfolios are financed from operating cash flows and borrowings from third parties. . . .
>
> We have been in the collection business for 56 years and started purchasing portfolios for our own account approximately 19 years ago. . . .
> We have established certain relationships with credit card issuers, other lenders and resellers that allow us to purchase portfolios directly through negotiated transactions, and we participate in the auction-style purchase processes that typify our industry. In addition, we enter into "forward flow" arrangements in which we agree to buy receivables that meet agreed upon parameters over the course of the contract term.
>
> We evaluate each portfolio for purchase using the proprietary valuation and underwriting processes developed by our in-house team of statisticians. Unlike many of our competitors, which we believe primarily base their purchase decisions on numerous aggregated portfolio-level factors, including the originator, the type of receivables to be purchased, or the number of collection agencies the accounts have been placed with previously, we base our purchase decisions primarily on our analysis of the specific accounts included in a portfolio. Based upon this analysis, we determine a value for each account, which we aggregate to produce a valuation of the entire portfolio. We believe this capability allows us to perform more accurate valuations of receivable portfolios. We have successfully applied this methodology to receivables across multiple asset classes.
>
> After we purchase a portfolio, we continuously refine our analysis of the accounts to determine the best strategy for collection. As with our purchase decisions, our collection strategies are based on account level criteria. Our collection strategies include: . . .
> \* outbound calling, driven by proprietary, predictive software, by our own collection workforce located at our three domestic call centers and our international call center in India; ....

6

30. According to Encore's 2013 Form 10-K, Encore *spent* more than $525 million to purchase consumer credit card accounts in the U.S. The face value of those accounts is in the tens of billions of dollars.

31. Moreover, Encore acquires portfolios for an average of approximately four cents on the dollar.

32. As MCM is acting as an agent on behalf of Encore and/or Midland Funding, both Encore and Midland Funding are vicariously liable for MCM's TCPA violations. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877-79 (9th Cir. 2014), *affd.*, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016).

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991 (TCPA), 47 U.S.C. § 227

33. In 1991, Congress enacted the TCPA, in response to a growing number of consumer complaints regarding certain telemarketing practices.

34. The TCPA regulates, among other things, the use of automated telephone equipment (i.e ATDS systems). Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of ATDS systems to make any call, including sending a text message, to a wireless number in the absence of an emergency or the prior express written consent of the called party.

35. According to findings by the FCC, the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls and texts whether they pay in advance or after the minutes are used.

36. The FCC has ruled that the word "call" in the TCPA includes both voice calls and text calls, and applies whether the text messages were sent by regular telephone transmission or over the internet to a wireless device. "TCPA Omnibus Declaratory Ruling and Order," FCC 15-72 at 56-62 (July 10, 2015), (available at "https://www.fcc.gov/document/tcpa-omnibus-declaratory-ruling-and-order.") (Reaffirming the FCC's 2003 ruling that text messages are "calls" under the TCPA and further ruling that text messages sent "internet to phone" and by other sources are also "calls.")

37. The TCPA "generally prohibits autodialed calls to wireless phones," but "provides an exception for autodialed and prerecorded message calls...made with the prior express consent of the called party." *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 512 (E.D. Wis. 2014) citing *In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C. Rcd. 559 ¶ 9 (Jan. 4, 2008); 47 U.S.C. § 227(b)(1)(A)(iii).

38. On February 15, 2012, the FCC released a Declaratory Ruling wherein it clarified that a party must obtain prior express written consent from the recipient prior to making automated calls to the recipient's cellular telephone. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("2012 FCC Declaratory Ruling"), 27 F.C.C.R. 1830, 27 FCC Rcd. 1830, 55 Communications Reg. (P&F) 356, 2012 WL 507959 (Feb, 15, 2012), at ¶ 2.

39. The FCC recently updated its rules on consent, requiring "prior express written consent" for calls or SMS text messages that contain an "advertisement" or "telemarketing." *See* 47 C.F.R. § 64.1200(f)(8).

40. In the same omnibus order, the FCC clarified "that a called party may revoke consent at any time and through any reasonable means. A caller may not limit the manner in

which revocation may occur." TCPA Omnibus Declaratory Ruling and Order," FCC 15-72 at 29-30; *ACA Int'l v. FCC*, 885 F.3d 687, 709-10 (D.C. Cir. 2018) (upholding the FCC's ruling that "'a called party may revoke consent at any time and through any reasonable means'—orally or in writing—'that clearly expresses a desire not to receive further messages.'").

41. The Court is bound by all of the FCC's final orders relating to the TCPA. *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, footnote 4 (E.D. Wis. 2014) citing *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010) (holding that under the Hobbs Act, the FCC's TCPA orders are binding); *Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010) (holding that under the Hobbs Act, the FCC's TCPA orders are binding).

## FACTUAL ALLEGATIONS

42. At all times relevant, Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

43. Defendants sought to collect debts that arose from consumer credit card transactions, incurred allegedly for personal, family or household purposes, and other debts incurred by a third party – Plaintiff's father.

44. Plaintiff only had personal, non-business credit card accounts. Plaintiff opened and used credit cards for personal use, namely, purchases of household goods and services.

45. Plaintiff opened his Menards credit card in or around 2014 or 2015, at a Menards retail store.

46. Menards is a regional retail store, located primarily in Midwest. Its website states:

> Menards® is headquartered in Eau Claire, Wisconsin and has more than 300 home improvement stores located in Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Wisconsin and Wyoming.

9

47. Menards contracts with Capital One, which issues a Menards-branded credit card called the "Big Card."

48. The "Capital One® Customer Agreement" applicable to Menards Big Card accounts does not contain an arbitration agreement.

49. Capital One's consumer credit card accounts do not contain arbitration agreements. *See* Bahney, Anna. "Does your credit card force you to give up your rights?" CNN Money, Nov. 30, 2017, available at https://money.cnn.com/2017/11/30/pf/arbitration-credit-cards/index.html ("Of the 30 issuers, representing 99% of all U.S. consumer card balances, nine did not have a forced arbitration clause including some of the biggest, including, Chase, Bank of America and Capital One.").

50. Plaintiff opened and used his Menards Big Card account for the purpose of purchasing personal and household goods at Menards stores, and not any commercial purpose.

51. Menards offers two different commercial credit accounts other than the consumer Big Card – a "Contractor Card," intended for small businesses, and a "Commercial Account" intended for "large companies and nonprofit organizations." Plaintiff's account was a consumer account.

52. Upon information and belief, one or more of the defendants – Encore and/or Midland Funding – purchased Plaintiff's Menard's account from Capital One sometime in 2017.

53. Fetai obtained his cell phone number in or around 2007 or 2008.

54. Fetai never provided his new cellular telephone number, ending in 2915, to MCM.

55. Fetai never provided MCM with express consent to receive prerecorded or automated calls by Defendant on Fetai's cellular telephone.

56. At some point in the last two years, Plaintiff's father, Ilaz Fetai, opened a "Boston Store" consumer credit card account, at a Boston Store retail store.

57. Plaintiff was not present when his father opened the Boston Store account. If he had been there, Plaintiff would have attempted to talk his father out of opening the account.

58. Boston Store was a department store chain owned by The Bon-Ton stores ("Bon-Ton"). Boston Store was founded in 1897 in Milwaukee, Wisconsin. Bon-Ton entered bankruptcy in February 2018. All of the brick and mortar stores closed in 2018, and Bon-Ton's assets were liquidated in 2018.

59. Prior to its parent's bankruptcy, Boston Store contracted with Comenity, which issued Boston Store consumer credit card accounts.

60. As Fetai's father, and not Fetai, opened the Boston Store account, Fetai had no contractual relationship with Comenity regarding the Boston Store account.

61. Upon information and belief, beginning in 2017, MCM began calling Fetai's cellular telephone in connection with the alleged Capital One and Comenity. These calls were made to Fetai's cellular telephone number, and consisted of repeated autodialed and/or prerecorded calls.

62. Plaintiff did not answer most of MCM's calls.

63. In or around April or May 2018, MCM called Plaintiff regarding Plaintiff's father's Boston Store account.

64. On that call, Plaintiff spoke with a MCM representative. Plaintiff told the MCM representative that the Boston Store account was not Plaintiff's but was Plaintiff's father's account. The MCM representative told Plaintiff that MCM could not discuss Plaintiff's father's account with Plaintiff.

65. Upon information and belief, MCM also called Plaintiff several times in April or May 2018 about Plaintiff's Menards account.

66. Defendant is, and at all times mentioned herein was, a "person," as defined by 47 U.S.C. § 153(39) ("The term 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation.")

67. All telephone contact by Defendant to Fetai on his cellular telephone occurred via an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), and/or used "an artificial or prerecorded voice" as described in 47 U.S.C. § 227(b)(1)(A).

68. The telephone number that Defendants used to contact Fetai, with an "artificial or prerecorded voice" and/or made by an "automatic telephone dialing system," was assigned to a cellular telephone service as specified in 47 U.S.C. § 227(b)(1)(A)(iii).

69. Fetai did not provide "prior express consent" allowing Defendants to place telephone calls to Fetai's cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system," within the meaning of 47 U.S.C. § 227(b)(1)(A).

70. Upon information and belief, MCM obtained Fetai's cellular telephone number through skip-tracing.

71. Defendant's telephone calls to Fetai's cellular phone were not "for emergency purposes" as described in 47 U.S.C. § 227(b)(1)(A).

72. Defendant's telephone calls to Fetai's cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system" for non-emergency purposes and in the absence of Fetai's prior express consent violated 47 U.S.C. § 227(b)(1)(A).

73. Under the TCPA, the burden is on Defendant to demonstrate that Fetai provided prior express consent within the meaning of the statute.

74. The Seventh Circuit has held that the "'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012); *see also Osorio v. State Farm Bank*, F.S.B., 746 F.3d 1242, 1251-52 (11th Cir. 2014) ("called party" means the current subscriber and not the prior subscriber or intended recipient for purposes of the TCPA).

## COUNT I

**KNOWING AND/OR WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227 *ET SEQ*.**

75. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

76. The foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227 *et seq*.

77. As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and each member of the Class are entitled to treble damages of up to $1,500.00 for each and every call in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

78. Plaintiff and all Class members are also entitled to and do seek injunctive relief prohibiting such conduct violating the TCPA by Defendants in the future. Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

## COUNT II

**VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227 *ET SEQ*.**

79. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

80. The foregoing acts and omissions of Defendant constitute numerous and multiple violations of the TCPA, including but not limited to each of the above cited provisions of 47 U.S.C. § 227 *et seq.*

81. As a result of Defendant's violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and Class members are entitled to an award of $500.00 in statutory damages for each and every call in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

82. Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting Defendant's violation of the TCPA in the future.

83. Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

## **CLASS ACTION ALLEGATIONS**

84. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated.

85. Plaintiff brings this action on behalf of a Class consisting of:

All persons within the United States who, on or after September 1, 2014, received a non-emergency telephone call from or on behalf of MCM to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice, and who either did not provide their cellular telephone number to the alleged creditor or who revoked prior express consent to contact the person's cellular phone.

Plaintiff Fetai represents, and is a member of, the Class. Excluded from the Class are Defendant and any entities in which Defendant has a controlling interest; Defendant's agents and employees; any Judge to whom this action is assigned and any member of such Judge's staff and immediate family; and claims for personal injury, wrongful death and/or emotional distress.

86. Class 2 is defined as:

All natural persons in the State of Wisconsin who were not sent an initial collection letter containing the validation notice required by 15 U.S.C. § 1692g, within five days after the

first telephone communication from MCM, seeking to collect a debt for personal, family or household purposes, on or after August 5, 2015, (e) that was not returned by the postal service.

87. Plaintiff does not know the exact number of members in each Class, but Plaintiff reasonably believes that Class members number at minimum in the hundreds for each Class.

88. Plaintiff and all members of each Class have been harmed by the acts of Defendant.

89. This Class Action Complaint seeks injunctive relief and money damages.

90. The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim. The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified easily through records maintained by Defendants and/or its agents.

91. There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact involving the class claims predominate over questions which may affect individual Class members. Those common questions of law and fact include, but are not limited to, the following:

a. Whether Defendant and/or its agents made non-emergency calls to Fetai's and Class members' cellular telephones using an automatic telephone dialing system and/or an artificial or prerecorded voice;

b. Whether Defendant and/or its agents utilized "skip tracing" methods to locate the cellular telephone numbers of non-customers;

c. Whether Defendant can meet its burden of showing it obtained prior express consent (*i.e.*, consent that is clearly and unmistakably stated), to make such calls;

15

d. Whether Defendant's conduct was knowing and/or willful;

e. Whether Defendant sent Fetai and other members of each Class an initial collection letter containing the validation notice required by 15 U.S.C. § 1692g, within five days after the first telephone communication from MCM.

f. Whether Defendant is liable for damages, and the amount of such damages;

g. Whether Defendant should be enjoined from engaging in such conduct in the future; and

h. Plaintiff asserts claims that are typical of each Class member. Plaintiff will fairly and adequately represent and protect the interests of the Class, and has no interests which are antagonistic to any member of the Class.

33. Plaintiff has retained counsel experienced in handling class action claims involving violations of federal and state consumer protection statutes, including claims under the TCPA.

34. A class action is the superior method for the fair and efficient adjudication of this controversy. Class-wide relief is essential to compel Defendant to comply with the TCPA. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small because the statutory damages in an individual action for violation of the TCPA are small. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated and the Class members, by definition, did not provide the prior express consent required under the statute to authorize calls to their cellular telephones.

35. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole

16

appropriate. Moreover, on information and belief, Plaintiff alleges that the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

## JURY DEMAND

45. Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all Class members the following relief against Defendants:

A. Injunctive relief prohibiting such violations of the TCPA by Defendant in the future;

B. As a result of Defendant's willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiff Fetai seeks for himself and each Class member treble damages, as provided by statute, of up to $1,500.00 for each and every call that violated the TCPA;

C. As a result of Defendant's violations of 47 U.S.C. § 227(b)(1), Plaintiff Fetai seeks for himself and each Class member $500.00 in statutory damages for each and every call that violated the TCPA;

D. An award of attorneys' fees and costs to counsel for Plaintiff and the Class;

E. An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing appropriate Classes and any Subclasses the Court deems appropriate, finding that Plaintiff is a proper representative of the Classes, and appointing the lawyers and law firms representing Plaintiff as counsel for the Classes;

F. Such other relief as the Court deems just and proper.

Dated: October 3, 2018

            **ADEMI & O'REILLY, LLP**

        By: <u>/S/ John D. Blythin</u>
            Shpetim Ademi (SBN 1026973)
            John D. Blythin (SBN 1046105)
            Mark A. Eldridge (SBN 1089944)
            Ben J. Slatky (SBN 1106892)
            3620 East Layton Avenue
            Cudahy, WI 53110
            (414) 482-8000
            (414) 482-8001 (fax)
            sademi@ademilaw.com
            jblythin@ademilaw.com
            meldridge@ademilaw.com
            bskatky@ademilaw.com